# 24-900

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**KEVIN MURPHY,**
**Plaintiff-Appellant,**

v.

**ONONDAGA COUNTY, THE ONONDAGA COUNTY SHERIFF'S DEPARTMENT, EUGENE CONWAY both Individually and in his capacity as Sheriff of Onondaga County, JOSEPH CICIARELLI both individually and in his capacity as Chief Police Deputy, MICHAEL DICKINSON, JAMMIE BLUMER, JONATHAN ANDERSON, JOSEPH PELUSO, ROY GRATIEN, JASON CASSALIA and CARL HUMMEL, all individually and in their capacities as employees of Onondaga County and the Onondaga County Sheriff's Department; WILLIAM FITZPATRICK both Individually and in his capacity as District Attorney of Onondaga County; STEFANO CAMBARERI, both individually and in his capacity as an employee and agent of both Onondaga County and William Fitzpatrick; MELANIE S. CARDEN, both individually and in her capacity as an employee of Onondaga County and LINDSEY M. LUCZKA, both individually and in her capacity as an employee of Onondaga County; BRYAN K. EDWARDS, both individually and in his capacity as an agent of Onondaga County; WESTCOTT EVENTS, LLC both individually and as an agent of Onondaga County,**
**Defendants - Appellees.**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

### APPELLANT'S BRIEF

Jeffrey R. Parry, Esq.
Counsel for the Appellant
Bar Roll No.: 508023
7030 E. Genesee Street
Fayetteville, N.Y. 13066
(315)412-9126
JeffreyParry404@gmail.com

TABLE OF CONTENTS

I. JURISDICTIONAL STATEMENT………………………..……………..1

II. STATEMENT OF ISSUES PRESENTED FOR REVIEW………..…………1

III. PRELIMINARY STATEMENT  ……………………………………………2

IV. STANDARD OF REVIEW AS APPLICABLE BELOW……….……………2

V. STATEMENT OF THE CASE…………………………………………………4

      The Amphitheater Incident…………………………………………...13

VI. SUMMARY OF THE ARGUMENT……………………………………22

VII. ARGUMENT AND AUTHORITIES……………………………….…..23

      SUPPERVISORY LIABILITY IS NOT AN ELEMENT
      IN PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS………....28

VIII. CONCLUSION………………………………………….………..30

## I. JURISDICTIONAL STATEMENT

**Kevin Murphy** appeals from the final order of the District Court for the Northern District of New York as a matter of right. The Decision and Order was rendered on  April 2, 2024, the Judgment was entered on April 5, 2024 and the Notice of Appeal was filed timely on April 6, 2024.

The district court had original jurisdiction over this matter pursuant to 28 U.S.C.A. § 1331 as it involves a federal question as well as supplemental jurisdiction under 28 U.S.C.A. § 1367. This Court has jurisdiction over this direct appeal from a final decision in the district court pursuant to 28 U.S.C. §1291.

## II. STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Whether the District Court abused its authority by dismissing this matter after failing to properly digest its own Rule 56 motion.

Ans. Yes. Speaking plainly, the District Court admitted to having never read plaintiff's papers and proceeded only on the Statement of Material Facts which were, in turn, necessarily misunderstood.

2.      Whether the District Court erred in finding that the Statement of Material Facts was inadequate in itself to overcome the Rule 56 motion.

Ans.   Yes. The Statement of Material Facts depicts events that are beyond the scope of Murphy's employment and depict matters of grave public concern.

1

3.     Whether Murphy was the subject of retaliation for political purposes of local politicians.

Ans.   Yes. The correspondence of the local District Attorney, the Administrative Judge and the Sheriff himself indicate that political favors were doled out at Murphy's great expense.

### III. PRELIMINARY STATEMENT

This is a matter improperly dismissed under a misapplication of procedural law. Thereafter, it was the subject of a misapplication of civil rights law imposed upon a incomplete record. Appellant's submitted evidence was simply ignored by the trial court and the law was imposed upon what remained.

### IV. STANDARD OF REVIEW AS APPLICABLE BELOW

The Standard applied to Summary Judgement motions is well known to the Court. Nevertheless, in the interests of clarity reflections upon the statute will regularly be made. As such, and for the convenience of the reader, relevant portions of the statute are reproduced below verbatim. Fed. R. Civ. P. 56.

> a)     Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> (c) Procedures.

2

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. USCS Fed Rules Civ Proc R 56.

The party opposing the motion must set forth facts showing there is a genuine issue for trial, and must do more than merely show there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). This is not an overly high barrier however. The defendant faces a calculus heavily weighted in favor of the non-moving party, to wit; "if no rational finder of fact could find in favor of the non-moving party, the court must grant a motion for summary judgment". *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir. 1994); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). In other words, the evidence must be overwhelming.

In this regard, the Court has tremendous discretion particularly in a case of the complexity as the matter herein.

Denial of summary judgment is addressed to discretion of court, in case that would benefit from full trial; summary judgment has, on occasion, been deemed inappropriate where fuller record is thought to be essential prerequisite to intelligent, informed resolution of complex questions of law; courts have often held that genuine issues of material fact exist, within meaning of summary judgment rule, where reasonable men differ about inferences to be drawn from undisputed

3

basic facts. *Johns v. IBM Corp.,* 361 F. Supp. 2d 184, 2005 U.S. Dist. LEXIS 3236 (S.D.N.Y. 2005).

## III. STATEMENT OF THE CASE

### A. Procedural History

Politely, this case, and to an extent its "companion" case *Glover v Onondaga County, et al.*, are procedural aberrations. In saying this, I do not mean to slight this Court nor, do I wish to disparage the Court below. Nevertheless, it is incumbent upon me to bring forth certain disparities that appear in the record and I regret the necessity of being so critical.  A29

This matter appears because it was dismissed upon the District Court's Order to Show Cause pursuant to FRCP 56(f).

> (f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:
> (1) grant summary judgment for a nonmovant;
> (2) grant the motion on grounds not raised by a party; or
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.
> FRCP 56(f).

The District Court made the following demands upon the Plaintiff and, of course, myself.

> ORDER TO SHOW CAUSE: Plaintiff shall have twenty-one (21) days in which to SHOW CAUSE why Onondaga County, the Sheriff's Department, Acting Personnel Commissioner Hummel, DA Fitzpatrick, ADA Carden, and/or ADA Luczka are not entitled to summary judgment on plaintiff's § 1983 First Amendment retaliation claims; If plaintiff intends to oppose dismissal of his remaining

4

federal claims against one or more of these defendants, he must submit evidence developed in discovery to establish that one or more of these defendants were personally involved in misconduct actionable under § 1983; Plaintiff's evidentiary submission must conform to Local Rule 56.1, which governs a party's statement of material facts; i.e., each fact on which plaintiff relies to establish his claim against one or more of these defendants must be supported by a specific citation to the record that would be sufficient to establish the cited fact at a trial; Plaintiff may also submit a memorandum of law, not to exceed ten pages in length, in response to this Order to Show Cause; If plaintiff timely complies, the Court will permit defendants to respond or oppose plaintiff's submissions; and Those additional deadlines, if necessary, will be set in due course. Signed by Judge David N. Hurd on 2/28/2024. (see) (Entered: 02/28/2024). Dkt 214, A29.

I made every effort to follow the directions of the District Court and the

Local Rules **exactly.** My submission to the Court was painstakingly constructed to

the precise formula provided. To wit;

> 56.1 Summary Judgment Procedure (formerly L.R. 7.1(a)(3)) (amended January 1, 2021) (a) Statement of Material Facts: Any motion for summary judgment shall contain a separate Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material **fact about which the moving party contends there exists no genuine issue.** Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion. Local Rule 56.1, *emphasis added.*

Moreover, Judge Hurd made specific mention of his requirements.

3. Plaintiff's evidentiary submission must conform to Local Rule 56.1,

which governs a party's statement of material facts; i.e., each fact on which plaintiff relies to establish his claim against one or more of these defendants must be supported by a specific citation to the record that would be sufficient to establish the cited fact at a trial;
4. Plaintiff may also submit a memorandum of law, not to exceed ten pages in length, in response to this Order to Show Cause;  A29.

Please note that a memorandum of law is <u>optional</u> although Judge Hurd repeatedly looks upon the lack of a memorandum as a failure on Plaintiff's part. Id. In this matter one was not submitted for the very simple reason that, I am very sure, the Court is familiar with §1983 retaliation claims. Frankly, the law as it applies to this matter is not the subject of debate rather, it is the complexity of the case itself. In this regard, the Court's attention is respectfully directed at Plaintiff's Appendix which, as this is written, contains 699 pages. It was over 800 when submitted to the District Court. In other words, the District Court received exactly what it asked for although, I am again very sure, it was not what was expected.

Thereafter, and upon submitting my papers, it occurred to me that Judge Hurd, having only recently been assigned to this matter after the unfortunate death of Judge Sharpe, might not be as familiar with the case as he might otherwise be. Therefore, as a curtesy to the Court *and not for tactical reasons*, I offered to provide a Brief should the Court require. Dkt 220. This was coursely refused as, I believe, the Court construed this as some tactical maneuver, but I assure this Court that it was not. I was justifiably concerned that the shear volume of material would overwhelm the trial court Judge and, in fact, it has.

6

This matter was filed very late in the evening of March 27, 2024. The Court issued its Decision and Order on April 2, 2024, 6 days later. Dkt 221. Contained in the interim period was the Easter Holiday so it is doubtful, speaking politely, that the case was given any attention over the weekend. As well, a 25-page Decision and Order was drafted. Therefore, with respect, I must conclude that my papers were given at most three days of attention and I sincerely doubt that any attempt was made to actually comprehend them. In fact, the Judge admits to ignoring Plaintiff's submissions in favor of only the Statement of Material facts. <u>That is immensely improper in that Plaintiff's evidence, painstakingly assembled for the Court, was totally ignored. The result is a matter that was entirely misunderstood and a record that is far from complete on review.</u>

Judge Hurd then relies on alleged mistakes or shortcomings in my papers to justify this state of affairs. His accusations are, very respectfully, simply incorrect. Specifically, my papers below consisted of a Statement of Material Facts, the Affidavit of Kevin Murphy and 49 separate exhibits. As a starting point, the following is pertinent.

> Plaintiff's statement of material facts presents only a haphazard recitation of salient events. Dkt. No. 219-2. The first half of the document refers to events that presumably involved his former employer, former supervisors, and/or former colleagues. Pl.'s Facts ¶¶ 1–19. But the § 1983 retaliation claims against those defendants have already been dismissed. Dkt. No. 213. The second half of plaintiff's statement of material facts does a little better job in the sense that it

actually mentions three of the remaining defendants; i.e., DA
Fitzpatrick and ADAs Luczka and Carden, but it appears to be telling
only half of a story: it jumps around from topic to topic without
establishing a coherent thread between any specific instances of
plaintiff's protected activity and any specific misconduct that could be
attributed to one or more of the remaining individual defendants. Pl.'s
Facts ¶¶ 20–53. A2 at 12.

Going further:

This makes the analysis more difficult. On summary judgment, "the
judge must ask himself not whether he thinks the evidence
unmistakably favors one side or the other but whether a fair-minded
jury could return a verdict for the plaintiff on the evidence presented."
*d* 477 U.S. at 252.

But in order to answer that bottom-line question, the Court needs to
know what plaintiff's version of the proof at trial would be. To that
end, Local Rule 56.1 instructs a party to put their version of events
into a single document: "a statement of material facts." That
document, in turn, must be supported by evidence that substantiates
each fact being offered. Importantly, though, the statement of material
facts should really be self-contained: it is supposed to "streamline the
consideration of summary judgment motions by freeing
district courts from the need to hunt through voluminous records
without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*,
258 F.3d 62, 74 (2d Cir. 2001), abrogated in part on other grounds by
*Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009).

This is simply untrue. First the Judge received EXACTLY what he and the

Local Rules asked for. Not only does the Statement of Material Facts contain

references to the exact data that Plaintiff relies upon to carry the day at trial, but the

Murphy Affidavit also contains like references to the evidence and addresses other

applicable issues such as the admissibility of evidence as well. A87, 35.

Admittedly complex, this took weeks to assemble. Further, the lower court

questions Murphy's ability to cite legal references but as he is a trained paralegal, these are entirely appropriate and certainly within his personal knowledge. The entirety of Plaintiff's response is, in fact, completely cross referenced but, of course, one must read it. The District Court clearly refused to do so.

As well, the lower Court's reliance upon *Holze v Rockefeller* is misplaced. *Holze v Rockefeller*, 258 F.3d 62 (2d Cir. 2001). To wit; in *Holze* the party failed to file a Statement of Material Facts at all. Id. Thereafter, the Court looked to the facts of the case, at least to some degree. Here, of course, a Statement of Material Facts was filed but the Court opted to ignore the other submissions and evidence entirely.

> Interpreting the predecessor to the current Local Rule 56.1, we held that "[a] Rule 9(g) statement by counsel on a motion for summary judgment cannot be a substitute for an affidavit as to the facts." *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 47 (2d Cir.1985). Likewise, district courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that "where there are no[ ] citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." Watt v. New York Botanical Garden, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *1 n. 1, 2000 U.S. Dist. LEXIS 1611, at n. 1 (S.D.N.Y. Feb. 16, 2000); see also IBS Ketel, Ltd. v. Korea Telecom Am., Inc., No. 98 CIV. 4856(DC), 2000 WL 821013, at *1 n. 1, 2000 U.S. Dist. LEXIS 8678, at *1 n. 1 (S.D.N.Y. June 22, 2000); Am. Auto. Assn. v. AAA Auto. Club of Queens, Inc., No. 97 CV 1180 SJ, 1999 WL 97918, at *3, 1999 U.S. Dist. LEXIS 8892, at *7 (E.D.N.Y. Feb. 8, 1999); Rivera v. Nat'l R.R. Passenger Corp., 152 F.R.D. 479, 484 (S.D.N.Y.1993). Allowing a Local Rule 56.1 statement to substitute for the admissibility requirement set forth in Fed.R.Civ.P. 56(e) "would be tantamount to the tail wagging the dog." Rivera, 152 F.R.D. at 484.

9

The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. See Monahan, 214 F.3d at 292; Watt, 2000 WL 193626, at *1 n.1, 2000 U.S. Dist. LEXIS 1611, at *2 n.1. The local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record. Where, as here, the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.1 See Zanghi, 752 F.2d at 47.
*Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73–74 (2d Cir. 2001)

Where, as here, the Judge finds that factual assertions in the Statement of Material Facts are not supported the record should be reviewed independently. It is nevertheless asserted that he will not find them wanting.

Even more importantly, the Judge fails to understand the Local Rules as presented. I remind the Court that Local Rule 56.1 states;

 The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party **contends there exists no genuine issue.** Local Rule 56.1, *emphasis added.*

Judge Hurd, on the other hand, states the rule should be read;

Presumably, that narrative thread could have been developed in a memo of law. But plaintiff chose not to file one. Alternatively, the Court could steel its nerve and wade into the "voluminous records" that plaintiff submitted in support of his statement of material facts. Dkt. Nos. 219 (exhibits 1 through 49).1 But that would defeat the explicit instructions given in the Show-Cause Order, which told plaintiff to put his own version of the relevant events into a statement of material facts that conformed with Local Rule 56.1.

But here the vacuous nature of the lower Court's claims is finally revealed. Rule 56.1 requires facts upon which there is "no genuine issue" whereas Judge Hurd wants my "own version". As I must however, I followed the Rule and gave the Court every piece of evidence in the Statement of Material Facts upon which there is "no genuine issue". Local Rule 56.1. Obviously, this does not encompass every fact in the case and there lies the misunderstanding.

Importantly, my version of the rule is consistent with the statute itself however. Rule 56 (f)(3). Statements of Material Facts should contain facts that are not in dispute and not simply a party's version. Id. As such, Judge Hurd should not have been surprised that every issue was not elucidated to his liking. Very simply, many of the elements of this case remain contested whether I, or Judge Hurd, like it or not. These elements represent "genuine issues" and are not included because they were not required under the Rule or the Statute. This is not to say that the likelihood of Plaintiff's victory is in question, it should not be, but rather that there are usually counterarguments and interpretations whether they would ultimately pass muster or not.

Stated differently, I could not be expected to wrongly represent contested issues as resolved when they were not.

Instead, plaintiff has told a partial version of the story in his statement of material facts, Dkt. No. 219-2, and invited the Court to delve into the other 810 pages of material to try to make heads or tails

of the rest of the narrative. That invitation must also be declined. Instead, the Court will confine the legal analysis to the documents requested in the Show-Cause Order: plaintiff's statement of material facts, Dkt. No. 219-2, and a memorandum of law, which plaintiff elected not to file, see Dkt. No. 220. A2 at 13.

Making every effort to be respectful, I am reminded of an old saying; "Be careful what you wish for because you just might get it." Judge Hurd asked for my evidence and it was provided. That it is voluminous and complicated is out of Plaintiff's control.

The District Court thus reveals that it has elected not to review Plaintiff's 810 pages of cross-referenced material and instead will rely only on Plaintiff's Statement of Material Facts which, as I previously stated, by definition only contains those elements of evidence upon which there is no issue. In other words, the Court has elected to go forward on an incomplete record. Furthermore, the Court cannot simply ignore evidence simply because it finds it inconvenient to read. Murphy's Affidavit contains admissible evidence that is understandable, lengthy though it may be.

This case involves multiple Constitutional violations committed over many years leading to the Plaintiff ultimately leaving work in the face of continued, undignified illegal actions, threats and hostility. The District Court could not possibly hope to educate itself as to the issues if it wouldn't even read the evidence.

**The Amphitheater Incident**

To delve into examples, and there are several, the Amphitheater Incident contains several examples of unconstitutionally abhorrent behavior and policies.

Keeping in mind that Murphy has already fallen afoul of his superiors by formally reporting the improper arrests of citizens and improper behavior of deputies on previous occasions, as well as filing the initial version of this lawsuit, Murphy encounters a relatively minor infraction at the Amphitheater and files a complaint. Murphy is not aware, nor could he be aware, that the individuals involved are politically connected. These individual defendants seek out the sources of their political influence, Judge James Tormey and District Attorney William Fitzpatrick, who dispense with their charges and turn on Murphy by attempting to indict him. Of course, the indictment fails because Murphy has done nothing wrong but they seek every possible avenue. Murphy, I remind the Court, is passed over for promotion several times and suffers on the job, his duties reduced to just about nothing, as a result. The excuse invoked is that Murphy's wife, another Sheriff's Deputy with some thirty years of experience, was at the scene when it occurred.

Returing to the narrative, Sergeant Kevin Murphy was a police officer for the Onondaga County Sheriff's Office from 1990 until 2020. In 2016, Murphy notified his superiors of false arrests, falsified police reports and illegal searches

and seizures. They were many and Murphy was justifiably concerned with the repercussions.

Within two weeks of this notification, Murphy was ordered to not do police work, to not investigate criminal conduct, not perform traffic stops, not document traffic accidents, not to complete search warrant applications, was not allowed to supervise deputies, was twice accused of criminal conduct (no resultant arrests) and suffered numerous internal investigations (no charges filed). Murphy was allowed to perform police work when assigned to the Onondaga County OnCenter/ Amphitheater (hereinafter "AMP"), particularly an assault investigation that occurred on July 21st, 2016 (victim Tim Howard) and was conducted through October, 2016, resulting in felony arrests from arrest warrants applied for in the Town of Geddes Court.

On June 24th, 2017, Murphy was the internal supervisor at the AMP and was dispatched to investigate an incident wherein an off-duty police officer intervened when a security officer threatened concert attendees with an unlawful arrest. The off-duty officer, by sheer coincidence, was Amy Murphy, Plaintiff Murphy's wife. Importantly, she was not part of the group of concertgoers being threatened with arrest by the security guard. The security guard struck Amy Murphy twice as she attempted to explain that the threat to arrest the concert attendees was improper and contrary to law. Again, Sergeant Murphy merely

14

responded to a dispatch of a man beating a woman however, prior to his arrival at the scene, Amy Murphy reported the incident to another off-duty police officer, a second police sergeant, Sergeant Rich VanOrden, that she had been struck by the security guard. Noteworthy is the fact that this second police supervisor took no action, did not write a report and did not investigate the incident. Further, the investigative records make no mention of his involvement.

Sergeant Murphy interviewed two security guards who were witnesses to the incident and both confirmed the security guard struck Amy Murphy in response to being verbally told that the offending actions by the concert goers complained of by the security guard were not in fact violations of any laws. Amy Murphy declined to pursue charges against the security guard.

Quizzically, the owner of the security company (Bryan K. Edwards) physically interfered and removed the security guard from the investigative interview despite Murphy's protestations. Sergeant Murphy notified the supervisor of the AMP detail, Captain Michael Pellizzari, of the incident and the improper actions of the security guard and the security company (Westcott Events). Captain Pellizzari subsequently advised Murphy that the security company threatened to go on strike if Murphy was allowed to continue working at the AMP. Pellizzari advised Murphy this decision was made by Onondaga County representatives

working at the AMP, later determined to be Onondaga County Deputy County Attorney Stefano Cambareri.

In September 2017, Murphy was notified by a Confidential Informant that the reason for the improper response from the security company was the offending security guard (Colenzo) was not a licensed security guard in New York State. Only in response to this, and as he had done numerous times in the past, Murphy opened a criminal investigation and coordinated gathering information with the Onondaga County District Attorney's Office to utilize Grand Jury subpoenas, with Judicial Endorsement, to obtain the appropriate New York State records. In other words, this was a investigation carried out in plain view of others.

That investigation revealed that the offending security guard was not licensed in 2017 however, it also revealed a very sordid and troubling history of all of the security guards involved. Specifically, Murphy learned that several other security guards were working at the AMP without proper security guard licensing due to prior State and federal convictions. *One of the guards was involved in a bombing incident and convicted federally.* These are not the sort one would want supervising a public venue and particularly one that often catered to children's events. Thus, Murphy felt compelled to move forward.

In October 2018, Murphy filed a whistleblower lawsuit against the Onondaga County Sheriff and several officers for the actions involving illegal

search and seizure, falsified police reports and civil rights violation (Murphy v. Onondaga Cnty., No. 5:18-CV-1218). Emphatically, and as Plaintiff's Complaint illustrates, the AMP incident was a small part of a very large problem of police abuse.

On or about October 19th, 2018, Murphy applied for Arrest Warrants and two local judges, endorsed the warrants and the matter proceeded beyond Murphy's hands.

On or about November 6th, 2018, NYSP made custodial arrests of both individuals. (It should be noted that NYSP officers are not within Murphy's chain of command.) The owner of the security company (Edwards) contacted Captain Pellizzari directly after the initial morning arrests on November 6th, 2018 and, thereafter, they received *incredibly* preferential treatment until they were released. Not coincidentally, and on that very same day, 5th Judicial Administrative Judge James Tormey received a telephone call from the father of one of the defendants. Tormey described the father as the husband of a 2018 candidate for office in Oneida County. Judge Tormey then began an investigation into the actions of Sergeant Murphy. Judge Tormey contacted Onondaga County District Attorney William Fitzpatrick to report on Murphy obtaining the Arrest Warrants and endorsements, and Fitzpatrick initiated a criminal investigation into Murphy, directing his Assistant District Attorney's to make inquiries on Murphy's 28-year

17

career as a police officer, obtaining Murphy's personnel, training and discipline records.

In February 2019, Murphy was notified by US Mail from Onondaga County District Attorney ADA Luczka that he was the target of a Grand Jury action and faces charges of Official Misconduct. The District Attorney's Office alleged that Sergeant Murphy was motivated by revenge for what transpired with his wife, and therefor the applications made for arrest warrants were improper. However, there were no charges for the felony assault, on for the security guard license issues. Retaliation is highly improbable regardless of ones perspective on this otherwise insignificant matter.

Simply put, there is no probable cause to arrest Murphy for anything nor, is there any reason for even the slightest suspicion. More telling is that the County District Attorney and the Administrative Judge for the Fifth Judicial District would involve themselves directly in a very insignificant matter. (Under New York law a B misdemeanor is punishable with only 90 days incarceration and it is highly unlikely that a jail sentence would ensue.)

Nevertheless, Murphy is forced to retain an attorney who contacts ADA Luczka and makes it clear Murphy intends to testify in any Grand Jury proceeding. Murphy is never contacted by the Onondaga County District Attorney's Office and never testifies in the Grand Jury. To date, Murphy has never received any

communication from the Onondaga County District Attorneys' Office advising him of the outcome of their investigation into his purported misconduct.

The criminal case is transferred by the 5th Judicial District to the Town of Camillus Court (Judge Poli). Fitzpatrick's office notifies the Town of Camillus Court that he doesn't wish to pursue the charges and they are dismissed. Inexplicably however, Fitzpatrick writes a letter to then-Sheriff Eugene Conway in 2019 explaining while there were no criminal charges against Murphy, *he should never be allowed to pursue investigations of any significance again.* This in fact happens.

Murphy has been told not to do police work. Ergo, he cannot pursue his profession, he cannot compete for promotions and, in fact, he is passed over for the rank of lieutenant three times.


It is critical to note that the concertgoers threatened by the security guard were never interviewed by either the Onondaga County Sheriff's Office nor the Onondaga County District Attorney's Office, even though identified in Murphy's report. Sergeant Murphy's police report was never reviewed or approved. The personal knowledge of the initial witnesses, of both the offending conduct of the security guard (Colenzo) as well as witnessing Colenzo strike Deputy

AJ Murphy, was ignored. The investigation initiated by Judge Tormey to DA Fitzpatrick, and conducted by the DA's Office falsely alleges that Deputy AJ Murphy was part of the disorderly group dealing with security guard Colenzo. Deputy AJ Murphy was not part of this group, did not attend the concert with this group, and only knew them as parents of Westhill High School students.

Even if Murphy had an improper motive, which he does not concede, it is immaterial to the investigation and arrest of Edwards and Colenzo. (*People v. Williams,* 69 A.D. 3rd 663, 893 N.Y.S. 2d 130 (2d Dep't 2010) ; *Restey v. Higgins,* 252 A.D. 2d 954, 675 N.Y.S. 2d 725 (4h Dep't 1998)).

Judge Tormey, and all of the other judges, District Attorney Fitzpatrick and his Assistant District Attorney's, and defense attorney William Sullivan, knew or should have known of this case law pertaining to probable cause to make an arrest. Interestingly, not one of the involved Judges involved in this case, nor the Onondaga County District Attorney William Fitzpatrick or his subordinates, make any references to these cases involving probable cause in their pursuit to criminally charge Murphy.

Moreover, Murphy did not seek to make a warrantless arrest of the two offending security guards; Murphy exercised substantive caution by applying for arrest warrants to the local criminal court and seeking endorsement from a local

magistrate where the defendant resided. In point of fact, the venue was convenient to the accused because it was near their home.

However, in 2019, Fitzpatrick wrote a letter to then Sheriff (and defendant in the federal lawsuit) Eugene Conway explaining that although they could not prove the crime alleged, Murphy should be prohibited from doing any future investigations. As DA Fitzpatrick's perversion of Brady / Giglio is unwarranted and unsupported in facts, it is clearly designed to taint future testimonial opportunities of Murphy, to infer impeachment of his character, including testifying as a plaintiff in his own lawsuit against Onondaga County.

More importantly, Fitzpatrick and Tormey were very powerful politicians in the upstate New York area. Their wishes would carry immense influence, unquestionable influence really, with every local official and especially the Sheriff. As a result, Murphy's career took an even more fateful turn.

Tormey knew of the federal lawsuit filed by Murphy against Onondaga County, Tormey was associated with these same Onondaga County officials listed in the lawsuit and should not have involved himself in this case. There is every appearance that the letter from Tormey to DA Fitzpatrick seeking an investigation into Murphy had the secondary effect of tainting Murphy's future testimony in the pending federal litigation, as being accused and convicted of 'Official Misconduct'

would surely discredit Murphy when testifying as a plaintiff in federal court. *See* Affidavit of Kevin Murphy at Exhibit 1.

## V. SUMMARY OF THE ARGUMENT

Defendant's arguments can be briefly stated.

1.)    The Court below asserts that dismissal is warranted on Plaintiff's First Amendment retaliation claims based upon the premise that he spoke not as a "citizen" but as an employee.

Response:    This is untrue. Plaintiff spoke on matters of immediate and dire public concern that were beyond his purview as a police officer. To wit: the arrest of individuals without probable cause, the outrageous hiring practices at the Amphitheater, the poor training of OCSD officers such that they improperly executed a warrant for a blood samples from a defendant at a local hospital and on and on.

2.)    It is asserted that the Plaintiff did not suffer any adverse employment action.

Response:    This is likewise untrue. Although entirely qualified, Plaintiff was passed over for promotion three times. Moreover, he was subjected to demeaning and useless duties such as having to sit in the "bad boy room" (a room containing nothing but a desk with no duties other than to stare at a blank wall), to inventory patrol cars housed out of doors in sub-zero temperatures, to not do police

work or supervise subordinates, to inspect bathroom facilities at the station, he was removed from work at the Amphitheater (thus, depriving him of overtime pay), though officer Amy Murphy was assaulted there was no investigation or other police action taken, a complaint was lodged against him by Anderson and Peluso because he did not initiate a proper "greeting", he was harassed by Dickinson because (Dickinson thought) Murphy had caused his paramour to stop sleeping with him, Dickinson ordered him not to do police work, transferred him and took away his command status, he was prevented from teaching at the police academy, etc.

3.      Finally, it is asserted that dismissal is proper because of a lack of proximate cause, that the time between cause and effect was too attenuated.

Response: This is likewise untrue. Murphy suffers consequences in time with every incident. Citing just one example, one week after the Amphitheater incident Murphy's duties and responsibilities are entirely taken away. See Statement of Material Facts a ¶51.

## VII. ARGUMENT AND AUTHORITIES

### PLAINTIFF'S FIRST AMENDMENT CLAIMS ARE ENTIRELY LEGITIMATE AND SHOULD NOT BE DISMISSED

A.      Plaintiff was not speaking in his capacity as a public employee but as a citizen when he complained of the illegal conduct of the Defendants.

"To succeed on a First Amendment claim brought pursuant to Section 1983, a plaintiff must be able to demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." *Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) (*citing Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003)).

Defendants point out that, to succeed on a claim pursuant to 42 U.S.C. §1983 he must prove that he was engaged in "protected first amendment activity", that he suffered an adverse employment action and that there was a causal connection between the protected activity and the adverse employment action. *Dillon v Morano*, 497 F.3d 247, 251 (2d Cir 2007). To do so, Plaintiff must demonstrate that the speech is protected via a two part test; (1) that he spoke as a citizen and (2) it was upon a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689, 2006 U.S. LEXIS 4341, 74 U.S.L.W. 4257, 152 Lab. Cas. (CCH) P60,203, 87 Empl. Prac. Dec. (CCH) P42,353, 24 I.E.R. Cas. (BNA) 737. Indeed, the day is long since gone when a public employer can condition employment upon a deprivation of the employee's rights to free speech. Id.

At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. See *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972). So long as employees are speaking as citizens about

matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. *See, e.g., Connick, supra*, at 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government"). *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689, 699, 2006 U.S. LEXIS 4341, *16-17, 74 U.S.L.W. 4257, 152 Lab. Cas. (CCH) P60,203, 87 Empl. Prac. Dec. (CCH) P42,353, 24 I.E.R. Cas. (BNA) 737.

In the matter at bar, the plaintiff spoke as a citizen as is evidenced by the individuals he addressed. Matters of general police malfeasance and policy, arrests without probable cause, racial bias in the Department, use of the OCSD for political purposes, falsified police reports, police cover-ups, etc, were brought to the attention of outside agencies, the Federal Bureau of Investigation,, the New York State Human Rights Commission and others concerning very public matters such as the employment of known criminals as security guards at the County owned Amphitheater, a citizens complaints ignored for racial reasons (the Tinker Tavern incident), political favors and influence peddling.

Bigotry is not a crime in spite of its evil nature. Going further, the cover-up of racially motivated acts as in the Timber Tavern incident may not constitute an actual and actionable violation of the law but it is offensive to the public's sensibilities be they termed political, moral or otherwise. As such, Murphy's speaking out on racially motivated police conduct is not within the scope of his

25

professional employment and it falls squarely within the realm of speech that the founders deemed most vital and therefore, protected.

Likewise, it also can't be legitimately argued that the political acts of Judge Tormey to protect a political patron fell within Murphy's job description. Indeed, it can't seriously be argued that hiring a unqualified and potentially violent criminal falls within the confines of his purview as a Sheriff's Deputy. Bad hiring decisions are simply not illegal even if the employee later commits an illegal act. Nor can it be argued that Dickinson's sexual escapades with a confidential informant fall within the range of activities of interest to a Sheriff's Deputy. Sordid though they may be, sexual affairs are simply not crimes but they are activities that can, and did, compromise the effectiveness of a police force.

Going further, defendants insist in the alternative that Murphy's reports as to inadequate training are necessarily within the course of his employment but this is emphatically not so. Indeed, poor training leads to the same constitutional deprivations as a deliberate, overt act. In the record above there are improper seizures, the blood sample depicted in Plaintiff's Complaint is a prime example, where a untrained deputy violated a constitutional right literally without knowing he did, such was the degree of malfeasance. Even if this is deemed protected, the cover-up of the misconduct is not.

Defendants have previously cited the Michael Tew incident as an example of Murphy behaving in the capacity of an employee. This is not so. Indeed, the "Tew Incident" a matter involving a suicide and the alteration of medical records at the Onondaga County Justice Center, was reported directly to the FBI. However, it is a matter of public interest because the nature and cause of Tew's death was never made known to his family, the cover-up went that far.

Even *Garcetti* acknowledges the prospect that workplace conversation may be protected under the First Amendment.

> Employees in some cases may receive First Amendment protection for expressions made at work. *See, e.g., Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public *421 employees like "any member of the general public," *Pickering*, 391 U.S., at 573, 88 S.Ct. 1731, to hold that all speech within the office is automatically exposed to restriction. *Garcetti v. Ceballos*, 547 U.S. 410, 420–21, 126 S. Ct. 1951, 1959, 164 L. Ed. 2d 689 (2006)

Indeed, the problem faced by respondent Ceballos in the Garcetti case was that he routinely wrote briefs and memos in his capacity as an assistant district attorney. As such, his further writing of the unconstitutionality of an indictment was a regular job function. In the matter at bar however, Murphy has no duty to report a cover-up by his superiors that is not a crime. Similarly, he has no duty to involve himself in the racial bias of Peluso or the sexual pastimes of Dickinson, these are not crimes but, they are matters of great public concern. As well, the

27

failure of the Sheriff's Department to follow policy and adequately investigate the death in Forian is not a crime. Murphy could have walked away, professionally unscathed, from what was in the end a failure to adequately train and supervise deputies. It required no response from him but he did so out of a concern for the same matters that beg the public interest and concern. The acts of Fitzpatrick in utilizing the Grand Jury to pursue his political enemies falls in this same category, perhaps not a crime but clearly a matter of grave public concern.

## SUPPERVISORY LIABILITY IS NOT AN ELEMENT
## IN PLAINTIFF'S CLAIMS AGAINST THE DEFENDANTS

B. Individual defendants were personally involved therefore rendering the Complaints against them altogether appropriate.

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.... As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.... Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.... For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Stevens v. City of Bridgeport, 607 F. Supp. 2d 342, 351 (D. Conn. 2009)

> Conversely. liability of defendant for deprivation of civil rights under 42

USCS § 1983 is predicated *only upon sufficient showing of that defendant's personal responsibility for claimed constitutionally impermissible conduct*; liability is not founded on his official position and doctrine of respondeat superior does not

apply. *Horowitz v. Anker*, 437 F. Supp. 495, 1977 U.S. Dist. LEXIS 14135 (E.D.N.Y. 1977), aff'd, 578 F.2d 1368 (2d Cir. 1978) *emphasis added.*

In that regard, Plaintiff's Complaint is replete with constitutional deprivations involving these very defendants personally, each making an effort to contribute to the demise and silencing of Kevin Murphy.

Conway -    Amongst other things, took orders from Fitzpatrick to attack Murphy by denying him the freedom to do his job. This turned out to be an extension of a political favor, a favor given to a Judge running for office, by the late Judge Tormey.

Anderson – Amongst other things, brought harassing charges against Murphy for "silent insolence" in retribution to Murphy's influence on Dickinson's paramour to stop their illicit affair, a matter of public concern because she was a confidential informant. Dkt 56 at 39.

Blumer – Amongst other things, brought wrongful blame upon Murphy for his disclosure of their error in a search warrant that led to an illegal seizure of a defendant's blood. Dkt 56 at 22.

Dickinson - Amongst other things, ordered Murphy not to do police work in the face of Murphy's revelations of improper police conduct, brought erroneous charges and actually placed Murphy under surveillance. Dkt 56 at 40.

## VIII.  CONCLUSION

In point of fact, this case is far to complex to be decided in a few pages of a summary judgment motion or, for that matter, a mere 30 page brief. In that regard, I am reminded that several courts have held that complex cases frequently do not lend themselves to dispositions in this manner. Complex cases where questions are not, and often cannot be, conveniently isolated as pure questions of law are not appropriately disposed of by summary judgment. *Elliott v. Elliott*, 49 F.R.D. 283, 1970 U.S. Dist. LEXIS 12502 (D.N.Y. 1970). On this alone, I would respectfully request that the Court deny the District Court's dismissal and return this matter to be fully litigated.

August 19, 2024                         Respectfully submitted,


_____
Jeffrey R. Parry
Bar Roll No. 508023
7030 E. Genesee Street
Fayetteville, N.Y. 13066
(315)412-9126
JeffreyParry404@gmail.com

30